IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


ARTHUR S. ROBINSON and ALLAN          )
BEISWENGER,                           )
                                      )
                    Plaintiffs,       )
                                      )
        vs.                           )
                                      )
FAEGRE BAKER DANIELS, LLP,            )
                                      )          No. 3:13-cv-0086-HRH
                    Defendant.        )
_____     )


O R D E R

Motion to Compel Arbitration;
Motions for Summary Judgment

        Defendant moves for summary judgment on plaintiffs' complaint for the

appointment of arbitrators.[1]  This motion is opposed[2], and plaintiffs' cross-move for an

order compelling the appointment of arbitrators.[3]  Plaintiffs' cross-motion, entitled a

_____

        [1]Docket No. 18.

        [2]Docket No. 27.

        [3]Docket No. 21.

motion to compel arbitration, is opposed.[4]  In addition, plaintiffs have filed a motion for summary judgment in the event that the court does not order arbitration,[5] in which they request summary judgment on the contract claims that they contend are subject to arbitration.  This motion is opposed.[6]  Oral argument was not requested on any of the pending motions and is not deemed necessary.

<u>Facts</u>

Plaintiffs are Arthur Robinson and Allan Beiswenger.  Defendant is Faegre Baker Daniels LLP.

Plaintiffs were two of the principals in the law firm of Robinson, Beiswenger, and Ehrhardt (RB&E).  In June 1992, RB&E entered into a fee division modification agreement (referred to herein as the "Fee Agreement") with defendant's predecessor, Faegre & Benson (F&B).[7]  The Fee Agreement "concern[s] the division of attorney's fees and payments of costs in the 'Glacier Bay' oil spill case ... and the 'Exxon Valdez' oil spill case...."[8]  The Fee Agreement's "Association" clause provides that

---

[4]Docket No. 26.

[5]Docket No. 28.

[6]Docket No. 31.

[7]Exhibit A, Declaration of James E. Torgerson [etc.], Docket No. 19.  The Fee Agreement superseded two earlier agreements between the parties.  <u>See</u> Exhibits B and C, Torgerson Declaration, Docket No. 19.

[8]Fee Agreement at 1, Exhibit A, Torgerson Declaration, Docket No. 19.

> RB&E has retained the services of F&B to assist in the representation of clients in the Glacier Bay case and the Exxon case. The relationship between F&B and RB&E, and the division of fees herein are governed by Alaska Bar Rule 35(e), concerning fee division between attorneys and Alaska Rule of Civil Procedure 81, and the ethics opinions adopted thereunder.[9]

Paragraph 4 of the Fee Agreement sets forth the parties' agreement as to "Glacier Bay Fees" and Paragraph 5 of the Fee Agreement sets forth the parties' agreement as to "Exxon Fees."[10] Only the division of "Exxon Fees" in Paragraph 5 is at issue here.

Paragraph 5(a) is entitled "Fee Division." Paragraph 5(a)(i) provides that "[a]ttorney's fees for all claims, except those set forth in section (a)(ii) of this paragraph, shall be divided on the basis of 70% to F&B and 30% to RB&E of the contingent fees collected from the client."[11] Paragraph 5(a)(ii) provides:

> All fees for claims originated by firms other than RB&E or F&B and referred to either firm for representation after April 15, 1992, shall be divided (from the allocated share of fees paid to F&B by other firms) on the basis of 90% to F&B, 10% to RB&E. However, any and all Upper Cook Inlet set and drift net claims so referred shall not be subject to this division and are subject to the division of fees set forth in paragraph 5, section (a)(i)[.12]

---

[9]Id.

[10]Id. at 3.

[11]Id.

[12]Id.

Paragraph 5(a)(iii) provides that "[a]ll hourly fees paid to both firms from the Exxon case management fee structure approved by the court or from any other source shall be allocated on the same basis, 70% F&B, 30% RB&E."[13]

Paragraph 5(b) is entitled "Other Claims."[14] Paragraph 5(b) provides that "[a]ll Exxon related claims of any type whether initiated by RB&E, F&B or other firms, arising out of the Exxon litigation shall be subject to this Fee Agreement."[15]

The Fee Agreement contains a severability clause that provides that "[i]f any clause, or provision herein contained shall be adjudged to be invalid, it shall not affect the validity of any other clause or provision of this agreement or constitute any cause of action in favor of either party as against the other."[16] The Fee Agreement also contains a "governing law" clause which provides that the "agreement shall be construed and interpreted in accordance with, and governed and enforced in all respects by, the laws of the State of Alaska and the Alaska Bar Rules."[17] And, the Fee Agreement contains a arbitration clause that provides:

---

[13] Id. at 4.

[14] Id.

[15] Id.

[16] Id. at 5-6.

[17] Id. at 6.

> Any controversy or claim arising out of or relating to this Agreement, or breach thereof, shall be settled by arbitration in accordance with the rules of the Alaska Bar Association. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.[18]

Under the terms of the Fee Agreement, F&B has paid RB&E $9,509,424.16 in Exxon fees between December 2002 and December 2011.[19]

Several months prior to RB&E and F&B entering into the Fee Agreement, the court, in the Exxon Valdez case, entered an order establishing the Consolidated Case Fund, which became known as the 3% Fund.[20] The 3% Fund was created "to compensate counsel appointed by the courts pursuant to the orders of December 22, 1989, as well as counsel performing administrative and substantive tasks at the direction of Co-Lead Counsel or the Case Management Team."[21] The compensation order provided that "[t]hree percent of any recovery received by any plaintiff, individually or as a member of a certified class, whether by judgment, settlement or otherwise, after February 14, 1991, shall be contributed to" the 3% Fund.[22] The compensation order further provided that

---

[18]Id.

[19]Exhibit Q, Torgerson Declaration, Docket No. 19.

[20]A copy of the order is attached as Exhibit D to the Torgerson Declaration at Docket No. 19.

[21]Exhibit D at 1-2, Torgerson Declaration, Docket No. 19.

[22]Id. at 2.

> [c]ounsel who are active members of the CMT or who perform administrative and/or other tasks benefitting the combined plaintiffs at the request or direction of Co-Lead Counsel or the CMT may apply for compensation from the [3%] Fund, whether or not said counsel are also applying for compensation from the Class Action Attorneys Fee Fund or being paid by their individual clients pursuant to engagement agreements.[23]

The compensation order also established a Fee Committee of five attorneys who were charged with "monitor[ing] all plaintiffs attorneys hours, disbursements and fee investments (calculated by the lodestar method)...."[24]

In April 2009, plaintiffs' lead counsel and All Plaintiffs' Fee Committee in the Exxon Valdez case moved for allocation of the 3% Fund.[25] In that motion, the Fee Committee proposed distributing $38,500 of the 3% Fund off the top to three firms and then dividing the remainder of the 3% Fund among 22 firms on a percentage basis.[26] The Fee Committee proposed that F&B would receive 14.868415% of the 3% Fund.[27] The Fee Committee's proposal included no distribution to RB&E because it had not characterized any of the time

---

[23]Id.

[24]Id. at 4.

[25]A copy of the motion is attached as Exhibit N to the Torgerson Declaration, Docket No. 19.

[26]Exhibit N at 9, Torgerson Declaration, Docket No. 19.

[27]Id. at 10.

it submitted to the Fee Committee as "P" time.[28]  "P" time was "for work claimed by counsel to be for case management activity or for work done at the request of Lead Counsel or the Executive Committee that benefitted both class and direct action claimants...."[29]  At no time prior to the allocation motion being filed did RB&E object to the Fee Committee's proposal that it not receive any portion of the 3% Fund.

On November 6, 2009, the court issued an "Order for Allocation and Partial Distribution of the 3% Fund."[30]  The court ordered that 15% of the 3% Fund be reserved because three firms had raised objections to the proposed allocation and those objections had yet to be resolved.[31]  RB&E was not one of the three firms.  The court ordered that the remaining 85% of the 3% Fund be distributed to the 22 law firms,[32] with F&B's percentage

---

[28]Declaration of Matthew D. Jamin (April 30, 2009) at 15, ¶ 35, Exhibit L, Torgerson Declaration, Docket No. 19.  It was probably not surprising that RB&E did not submit any "P" time because RB&E was a "direct-action firm" and "was not assigned roles on behalf of all plaintiffs[.]" Declaration of Matthew D. Jamin (October 30, 2013) at 2, ¶ 6, Docket No. 20.

[29]April 30, 2009 Jamin Declaration at 7, ¶ 13, Exhibit L, Torgerson Declaration, Docket No. 19.

[30]A copy of the order is attached as Exhibit O to the Torgerson Declaration, Docket No. 19.

[31]Exhibit O at 9, Torgerson Declaration, Docket No. 19.

[32]Id.

set at 14.749988%.[33]  After the disputes with the three objecting law firms were resolved, the court issued a final disbursement order on February 22, 2011.[34]  Under the final order, F&B received 14.64136% of the remaining funds in the 3% Fund.[35]

On June 1, 2011, Beiswenger wrote to Brian O'Neill of F&B advising that he "believe[d] that the funds received by F&B from the case management pool should be subject to the 70%/30% division that is provided for" in Paragraph 5(a)(iii) of the Fee Agreement.[36]  Beiswenger stated that "[s]ince we have not previously discussed this, we wanted to bring this to your attention and get your thoughts on the matter."[37]

O'Neill responded to Beiswenger on June 17, 2011.[38]  He stated that it was F&B's view that this court had already resolved issues relating to the Fund's allocation, a process in which Beiswenger had chosen not to participate.[39]  O'Neill explained that it was F&B's

---

[33]Id. at 9-10.

[34]A copy of the order is attached as Exhibit P to the Torgerson Declaration, Docket No. 19.

[35]Exhibit P at 3, Torgerson Declaration, Docket No. 19.  Plaintiffs allege that F&B and defendant "collected at least $5,114,904.18 from the 3% Fund."  Complaint [etc.] at 2, ¶ 4, Docket No. 1.

[36]Exhibit R at 1, Torgerson Declaration, Docket No. 19.

[37]Id.

[38]Exhibit S, Torgerson Declaration, Docket No. 19.

[39]Id. at 1.

view that the Fee Agreement only applied to <u>hourly</u> fees and "that the Fund was not allocated on an 'hourly' fee basis."[40]  He also stated that case law "establishes that courts are not bound by fee allocation letters, particularly in situations where one firm's contributions greatly exceed the allocation percentages, which is plainly the case here."[41]

On August 21, 2012, Robinson submitted a demand for fees to defendant, requesting "the payment of our[42] full share of attorneys fees under our fee division agreement which includes a 70%/30% division of any fees received by F&B from any source.  We contend that F&B owes us 30% of any fees it received from the attorney's fee pool in the Exxon case."[43]

On September 13, 2012, defendant "reject[ed] [Robinson's] demand in its entirety" because "Faegre has fully complied with the Fee Division Modification Agreement and all other obligations related to the Exxon litigation.  Faegre has paid to you all that was owed to you, and we don't intend to pay anything more."[44]

_____

[40]<u>Id.</u> at 2.

[41]<u>Id.</u>

[42]The third named partner of RB&E, Peter Ehrhardt, after receiving a copy of the demand letter, informed Robinson that he was "opposed to this course of action" and requested that Robinson not make any references that implied that Robinson represented his (Ehrhardt's) interests.  Exhibit U at 1, Torgerson Declaration, Docket No. 19.

[43]Exhibit T at 1, Torgerson Declaration, Docket No. 19.

[44]Letter from William R. Busch, Faegre Baker Daniels LLP, to Arthur S. Robinson,
(continued...)

On May 24, 2013, plaintiffs commenced this action by filing a complaint entitled "Complaint for Appointment of Arbitrators Pursuant to Alaska Statute 09.43.030."[45] Plaintiffs allege that they are seeking enforcement of the arbitration clause in the Fee Agreement.[46] Plaintiffs allege that the issue of whether they, "as successors of RB&E", are entitled to 30% of the monies that F&B and defendant have collected from the 3% Fund is an "arbitrable dispute."[47] Plaintiffs allege that "[a]t the arbitration", they "intend to pursue claims against [defendant] ... for an accounting, breach of contract, breach of fiduciary duties, unjust enrichment, and other claims as may be just and proper."[48] In their prayer for relief, plaintiffs request that

> the court, in accordance with AS 09.43.030, and the arbitration clause in the parties' Fee Division Modification Agreement, order arbitration of the parties' dispute, and appoint and order compensation for three arbitrators (two attorneys, including an attorney chair, and one layperson) from the list of arbitrators provided by the Alaska Bar Association....[49]

---

[44](...continued)
Robinson & Associates, at 1, Exhibit V, Torgerson Declaration, Docket No. 19.

[45]Docket No. 1.

[46]Id. at 2, ¶ 4.

[47]Id.

[48]Id. at 8, ¶ 26.

[49]Id. at 9-10.

Plaintiffs and defendant now cross-move for summary judgment on plaintiffs' single claim seeking an order compelling arbitration. Plaintiffs also move for summary judgment on their contract claims should the court not order arbitration.

Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. <u>Id.</u> at 255. "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." <u>T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 (9th Cir. 1987).

"A dispute is arbitrable under federal law if the agreement 'creates a duty for the parties to arbitrate the particular' dispute." <u>Lexington Marketing Group, Inc. v. Goldbelt</u>

Eagle, LLC, 157 P.3d 470, 473 (Alaska 2007) (quoting AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)).  "Alaska state law mirrors federal law and provides that courts are the proper forum to determine whether a dispute is arbitrable." Id.  Under Alaska law, "[a] written agreement to submit an existing controversy to arbitration or a provision in a written contract to submit to arbitration a subsequent controversy between the parties is valid, enforceable, and irrevocable, except upon grounds that exist at law or in equity for the revocation of a contract."  AS 09.43.010(a).

Defendant first argues that the arbitration clause is unenforceable because the Exxon Valdez litigation was a class action and thus the principles governing allocation of attorney's fees in class actions apply here.   "In class actions, the district court has broad authority over awards of attorneys' fees[.]"  In re FPI/Agretech Securities Litig., 105 F.3d 469, 472 (9th Cir. 1997).  Fees in a class action "derive from principles of equity, not contract."  Id. at 474.

> [A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.  The common-fund doctrine reflects the traditional practice in courts of equity, and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees[.]  The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.  Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's

> fees against the entire fund, thus spreading fees proportion-
> ately among those benefitted by the suit.

Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980) (internal citations omitted).  In class

actions, "[d]istrict courts may refuse to accept a fee allocation agreement whenever there

is good cause to do so."  In re FPI/Agretech Securities Litig., 105 F.3d at 473.  For example,

"a court may reject a fee allocation agreement where it finds that the agreement rewards

an attorney in disproportion to the benefits that attorney conferred upon the class—even

if the allocation in fact has no impact on the class."  Id.; see also, Allapattah Srvcs., Inc. v.

Exxon Corp., 454 F. Supp. 2d 1185, 1227 (S.D. Fla. 2006) (declining to enforce fee allocation

agreement because it would "result in a grossly disproportionate award among the five law

firms in relation to services actually rendered, and benefits bestowed on the class").

Defendant argues that in this case plaintiffs are seeking attorney's fees from the 3%

Fund that are grossly disproportionate to the value of the services RB&E provided for the

benefit of all Exxon Valdez plaintiffs.  Thus, defendant contends that plaintiffs' reliance on

the Fee Agreement for its claim to a substantial share of the 3% Fund is inconsistent with

the equitable principles applicable to the court's allocation of common funds.  Defendant

also emphasizes the fact that the court has already determined in its Allocation Order that

F&B made substantial contributions to the litigation for the benefit of the class and that

RB&E did not make any contributions for the benefit of the class.  Defendant argues that

this decision by the court should be given collateral estoppel effect and plaintiffs should

not be allowed to disturb the allocations of the 3% Fund that the court has already made. In short, defendant argues that plaintiffs' request to arbitrate their rights to any portion of the 3% Fund is an inappropriate attempt to circumvent the court's exclusive authority to determine fee allocations as to the 3% Fund.

"Alaska's arbitration law closely follows federal arbitration law, and federal law has clarified that arbitration clauses are severable from the underlying contracts for purposes of challenges to the validity of the underlying agreement. Determinations as to the validity of the underlying contract are a matter for the arbitrator to decide." Lexington Mktg. Group, 157 P.3d at 477. "[C]ourts may consider challenges of illegality to arbitration agreements but not to the underlying contracts." Id. at 475.

What defendant is arguing here is that the court should not enforce the Fee Agreement as it pertains to any fees related to the 3% Fund because enforcing the Fee Agreement could result in plaintiffs receiving over $1 million in attorney's fees from the 3% Fund even though RB&E did no work that benefitted the class. This argument, however, has nothing to do with whether plaintiffs' contract claims are subject to arbitration. Defendant's argument does not go to the question of whether the arbitration clause is enforceable, but rather is an argument that the Fee Agreement is unenforceable, if it requires that fees be divided as plaintiffs contend. At this juncture, the court can only

determine the enforceability of the arbitration clause; it cannot consider whether the rest of the Fee Agreement is enforceable or not.

Defendant next argues that plaintiffs are prohibited from receiving a portion of F&B's payments from the 3% Fund because the Fee Agreement is subject to Alaska Bar Rule 35(e). Alaska Bar Rule 35(e) provides:

> A division of fees between attorneys who are not in the same law firm may be made only if:
>
> (1) the division is in proportion to the services performed by each attorney or, by written agreement with the client, each attorney assumes joint responsibility for the representation;
>
> (2) the client is advised of and does not object to the participation of all the attorneys involved; and
>
> (3) the total fee is reasonable.

Defendant argues that any division between F&B and RB&E of F&B's payments from the 3% Fund would have to be "in proportion to the services performed by each attorney" because F&B and RB&E did not have written agreements with each class plaintiff. Because the court has already allocated the 3% Fund based on the contributions of the attorneys involved in case management and did not award RB&E any funds, defendant contends that RB&E is stuck with that allocation. Defendant argues that at a minimum, in order to ensure that the class plaintiffs were adequately protected, any fee-splitting agreement affecting the

common fund should have been brought to the specific attention of the court and approved by the court before allocations from the 3% Fund were made.

As with defendant's first argument, this argument too goes to the merits of plaintiffs' claims, which are based on a contention that, pursuant to Paragraph 5(a)(iii) of the Fee Agreement, they are entitled to a portion of the fees that F&B collected from the 3% Fund. This argument is not directed at the issue that is before the court, which is whether plaintiffs' contract claims are subject to arbitration. Defendant's Alaska Bar Rule 35(e) argument may be an argument that the arbitrator(s) can consider, but it is not an argument that the court can consider in deciding whether plaintiffs' contract claims are subject to arbitration.

Defendant next argues that the parties did not agree to arbitrate any claims relating to the 3% Fund. "Because arbitration is a matter of contract, parties can only be compelled to arbitrate a matter where they have agreed to do so." <u>Lexington Mktg. Group</u>, 157 P.3d at 477. "[T]he court must interpret the arbitration clause to determine whether it extends to the dispute at issue." <u>Id.</u> at 475 n.27. The arbitration clause in the Fee Agreement provides that "[a]ny controversy or claim arising out of or related to this Agreement, or breach thereof, shall be settled by arbitration...."[50] The scope of such an arbitration clause is "quite broad." <u>Johnson v. Aleut Corp.</u>, 307 P.3d 942, 950 (Alaska 2013).

---

[50]Fee Agreement at 6, Exhibit A, Torgerson Declaration, Docket No. 19.

But, defendant argues that it is not broad enough to encompass plaintiffs' claim that they are entitled to 30% of F&B's share of the 3% Fund. Defendant argues that the payments F&B received from the 3% Fund are not subject to the Fee Agreement and thus do not "arise out of or relate to" the Agreement. Defendant argues that the Fee Agreement only calls for the division of "contingent fees collected from the client" and "hourly fees paid to both firms from the Exxon case management fee structure approved by the court...."[51] And, defendant argues that F&B's payments from the 3% Fund do not fall into either of these categories.

First, defendant argues that the 3% Fund payments were not "contingent fees" collected from F&B and RB&E's direct action clients. Rather, defendant contends the payments were to compensate F&B for its work on the CMT and for its performance of administrative and other tasks that benefitted All Plaintiffs. Second, defendant argues that the payments from the 3% Fund were not "hourly fees paid to both firms from the Exxon case management structure approved by the court" because the 3% Fund was not linked to "hourly fees." Defendant contends that disbursements from the 3% Fund did not involve compensation of counsel on the basis of the recipients' hourly rates multiplied by the time they spent on the litigation. Rather, defendant contends that certain firms were awarded a percentage of the 3% Fund based on equitable factors, although the court would

---

[51]Fee Agreement at 4, ¶ 5(a), Exhibit A, Torgerson Declaration, Docket No. 19.

note that the number of hours the firms devoted to work that benefitted the class was the starting point for determining the percentages.

Defendant also argues that Fee Agreement's drafting history supports its contention that payments from the 3% Fund are not covered by the Fee Agreement. Paragraph 5(a)(iii) of the Fee Agreement provides that "[a]ll hourly fees paid to both firms from the Exxon case management structure approved by the court or from any other source shall be allocated on the same basis, 70% F&B, 30% RB&E."[52] Defendant contends that F&B and RB&E included this paragraph in the Fee Agreement due to a concern that the court could impose a lodestar structure on direct-action attorneys, which could have then voided F&B's and RB&E's individual fee agreements with their direct-action clients. As proof of this, defendant cites to O'Neill's June 2011 letter to Beiswenger, in which O'Neill stated that "[t]he purpose of this provision was to take care of possible imposition by the class of a lodestar structure on direct action lawyers, voiding our client fee agreements. This was a serious concern at the time, and was something the district court could have done."[53]

The foregoing all has to do with how the 3% Fund was allocated and little to nothing to do with the question of whether plaintiffs' contract claims are subject to arbitration. Defendant's argument that the 3% Fund is not covered by the Fee Agreement goes to the

---

[52]Fee Agreement at 3-4, ¶ 5(a)(iii), Exhibit A, Torgerson Declaration, Docket No. 19.

[53]Letter from O'Neill to Beiswenger at 2, Exhibit S, Torgerson Declaration, Docket No. 19.

merits of plaintiffs' underlying claims, rather than to the question of whether those claims are subject to arbitration.

As to that question, the arbitration clause in the Fee Agreement provides that all claims and controversies arising out or related to the Fee Agreement are subject to arbitration. Plaintiffs' claims, which are based on their contention that the Exxon fee division provisions in the Fee Agreement entitle them to a percentage of F&B's share of the 3% Fund, fall within the scope of this clause. Arbitrating these claims will not "limit ... the exercise of a court's inherent judicial function," as defendant suggests. <u>Calif. Trucking Ass'n v. Brotherhood of Teamsters & Auto Truck Drivers, Local 70</u>, 679 F.2d 1275, 1283 (9th Cir. 1981). Having an arbitrator determine what RB&E's and F&B's private agreement was intended to mean and how it applies between them in no way interferes with the court's authority to allocate the 3% Fund. Plaintiffs' call for arbitration does not involve a review of the allocation determination made by the court. Rather, plaintiffs seek to have arbitrators decide whether the Fee Agreement provided that RB&E would be entitled to a portion of the fees that the court allocated to F&B out of the 3% Fund.

Finally, defendant argues that plaintiffs are not entitled to an order compelling arbitration because the arbitration clause is unenforceable due to impossibility. Under Alaska law, impossibility of performance discharges a party from performance under the

contract.  N. Corp. v. Chugach Elec. Ass'n, 518 P.2d 76, 80 (Alaska 1974), vacated on other grounds by 523 P.2d 1243 (Alaska 1974).

The arbitration clause provides that controversies and claims arising out of or related to the Fee Agreement "shall be settled by arbitration in accordance with the rules of the Alaska Bar Association."[54]  The Alaska Bar Association, pursuant to its policy "to encourage the amicable resolution of fee disputes between attorneys and their clients" has established a "Fee Dispute Resolution Program ... for the arbitration of disputes concerning any and all fees paid, charged, or claimed for professional services by attorneys."[55]

Defendant argues that the arbitration procedures established by the Alaska Bar Association apply only to fee disputes between attorneys and their clients.  Since this is not a fee dispute between an attorney and a client, defendant argues that it would be impossible to arbitrate the parties' dispute under the rules of the Alaska Bar Association.

Plaintiffs concede that the Alaska Bar Association Fee Dispute Resolution rules do not apply because their complaint expressly seeks arbitration pursuant to AS 09.43.030. Based on that statute, plaintiffs argue that arbitration clause is enforceable even if the Alaska Bar Association cannot hear fee disputes between attorneys.  AS 09.43.030 provides:

> If the arbitration agreement provides a method of appointment
> of arbitrators, this method shall be followed. If no method of

---

[54]Fee Agreement at 6, Exhibit A, Torgerson Declaration, Docket No. 19.

[55]Alaska Bar Rule 34(a).

appointment is provided, or if the agreed method fails or for any reason cannot be followed, or when before the hearing an arbitrator appointed fails or is unable to act and a successor has not been appointed, the court on application of a party shall appoint one or more arbitrators. An arbitrator so appointed has all the powers of one specifically named in the agreement.

The Alaska Supreme Court has never construed AS 09.43.030, but this provision is similar to § 5 of the Federal Arbitration Act (FAA). Section 5 of the FAA provides:

If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

9 U.S.C. § 5. In Reddam v. KPMG LLP, 457 F.3d 1054, 1057 (9th Cir. 2006), abrogated on other grounds as recognized by Atlantic Nat'l Trust LLC v. Mt. Hawley Ins. Co., 621 F.3d 931, 940 (9th Cir. 2010)), the arbitration clause provided that "[a]ny arbitration under this agreement shall be determined pursuant to the rules then in effect of the National Association of Securities Dealers, Inc." The NASD refused to take jurisdiction over the arbitration because "no named party was a member or associated person of the NASD." Id. The defendants argued that the court should exercise its authority under 9 U.S.C. § 5

to appoint a substitute arbitrator. The district court however held that the claims were no longer subject to arbitration because the NASD would not hear them. Id. The court of appeals reversed, holding that the arbitration clause did not become "unenforceable between the parties when the NASD bowed out. There is no evidence that naming of the NASD was so central to the arbitration agreement that the unavailability of that arbitrator brought the agreement to an end." Id. at 1061. The court compared its decision to its "approach to forum selection clauses which choose a particular court as the litigation arena. There we have not treated the selection of a specific forum as exclusive of all other fora, unless the parties have expressly stated that it was." Id.

Similarly here, the arbitration clause is not unenforceable. The Alaska Bar Association Fee Dispute Resolution procedures cannot apply to this fee dispute between two law firms, which means the parties' agreed upon method of arbitration has failed. But, that does not render performance under the arbitration clause impossible. Rather, it means that this case is governed by AS 09.43.030. Pursuant to AS 09.43.030, the court can appoint one or more arbitrators to hear the parties' dispute. Contrary to plaintiffs' contention, however, the arbitrators do not have to be appointed from the Alaska Bar Association list of arbitrators, which plaintiffs have attached to their complaint as Exhibit 4. Rather, pursuant to AS 09.43.030, the court "shall appoint one or more arbitrators" based on the parties' application(s) for such an appointment. In sum, the arbitration clause is

enforceable, and plaintiffs' motion to compel arbitration pursuant to AS 09.43.030 is granted.

Conclusion

Based on the foregoing, defendant's motion for summary judgment[56] is denied. Plaintiffs' motion to compel arbitration[57] is granted. Plaintiffs' cross-motion for summary judgment[58] is denied as moot.

The court will entertain the parties' applications for the appointment of one or more arbitrators pursuant to the Alaska Uniform Arbitration Act, AS 09.43.10-.180. Applications for the appointment of one or more arbitrators shall be filed on or before April 16, 2014.

DATED at Anchorage, Alaska, this <u>26th</u> day of March, 2014.

/s/ H. Russel Holland<br>United States District Judge

---

[56]Docket No. 18.

[57]Docket No. 21.

[58]Docket No. 28.